Filed 1/26/24  In re Elijah E. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re Elijah E. et al., Persons Coming Under the Juvenile Court Law. | B318536 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> E.E., <br><br> Defendant and Appellant. | (Los Angeles County Super. Ct. No. 21CCJP01933A–B) |

APPEAL from an order of the Superior Court of Los Angeles County.  Gabriela H. Shapiro, Juvenile Court Referee.  Conditionally affirmed and remanded with directions.

Emery E. Habiby, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jacklyn K. Louie, Deputy County Counsel, for Plaintiff and Respondent.

_____

**INTRODUCTION**

E.E. (Mother), the mother of minors Elijah E. and C.E., appeals from the juvenile court's jurisdictional findings and dispositional order, declaring the children dependents under Welfare and Institutions Code[1] section 300, subdivisions (b) and (j), and removing them from Mother's custody. On appeal, Mother argues that (1) the evidence was insufficient to support each of the jurisdictional findings and the removal order; (2) the juvenile court abused its discretion in ordering Mother to participate in mental health counseling and in restricting her to monitored visits; and (3) the Los Angeles County Department of Children and Family Services (DCFS) failed to comply with the inquiry requirements of the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) and related California law.

We conclude the juvenile court's jurisdictional findings and removal order were supported by substantial evidence based on Mother's medical neglect of Elijah, and inability to provide both children with proper care and supervision. We further conclude the juvenile court acted within its discretion in ordering mental health services and monitored visitation for Mother. However, because DCFS failed to comply with its duty of inquiry as to the children's maternal extended family, we conditionally affirm the dispositional order and remand for ICWA compliance.

_____

[1] Unless otherwise stated, all further undesignated statutory references are to the Welfare and Institutions Code.

2

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.    Prior child welfare history**

Mother has two children who are the subject of the current proceedings:  Elijah, born in February 2009, and C.E., born in October 2010.  Michael G. is the alleged father of Elijah, and the father of C.E. is unknown.

Mother and Michael also have four older children who were prior dependents of the juvenile court due to Mother's substance abuse, the parents' domestic violence, and the parents' medical neglect of one of the children.  All four children were later adopted.  Between 2010 and 2018, DCFS received numerous child welfare referrals for Elijah and C.E. based on allegations of physical, emotional, or sexual abuse and general neglect.  DCFS closed one referral as unfounded and the others as inconclusive.

**II.   Dependency petition**

On April 26, 2021, DCFS filed a dependency petition on behalf of Elijah and C.E. under section 300, subdivisions (a), (b), (c), and (j).  DCFS later amended the petition to include additional counts.  As relevant to this appeal, the amended petition alleged the children were at substantial risk of harm based on:  (1) Mother's failure to provide for Elijah's mental health needs; (2) Mother's inability to provide both Elijah and C.E. with ongoing care and supervision due to the children's behaviors; (3) Mother's failure to protect Elijah from physical abuse by her male companion, Richard B.; (4) Richard's current abuse of marijuana and alcohol; and (5) Mother's current use of marijuana and history of substance abuse.

This matter first came to DCFS's attention on March 21, 2021, after law enforcement officers found then 10-year-old C.E. on the street, barefoot and smoking a cigarette.  He appeared

3

hungry and dehydrated. While the child refused to provide any identifying information, the officers learned that Mother had reported him as missing.

Later that day, a DCFS social worker met with Mother. According to Mother, she and the children lived with her boyfriend, Richard B. Mother was disabled and received supplemental security income (SSI) benefits. While she did not know the nature of her disability, she denied any mental health or developmental delay history. Elijah also received SSI benefits based on a diagnosis of ADHD and autism. Elijah's psychiatrist at Augustus Hawkins Mental Health Center prescribed him medication, but Mother had not yet picked up the latest refill. C.E. also had been diagnosed with ADHD, but was not prescribed medication. Earlier that morning, Mother sent the children outside to play. When Elijah returned home without C.E., Mother called the police.

Two days later, on March 23, 2021, C.E. again ran away. Law enforcement officers found the child a short time later at a Metro station. DCFS recommended services for the family. Although the social worker repeatedly attempted to meet with Mother to discuss services, Mother did not make herself available for an in-person visit.

On April 15, 2021, Mother called the social worker. She reported that she had enrolled in a parenting class, and expressed concern that the children's behavior was getting out of control. Mother stated that Elijah was taken off his medication six months earlier, and she wanted him to start taking it again. She also reported that, during a recent doctor's visit, the children ran off and stole someone's wallet. When the social worker inquired about mental health services for the children, Mother

4

replied that all of her energy was going toward finding a home, and that she was not stable enough to ensure the children attended therapy. She later accepted a referral for therapy for the children, but was uncertain about her ability to maintain it.

The social worker also spoke with the children's maternal grandmother and Elijah's godmother. They both stated that Mother was doing her best, but it was difficult for her to manage the children's behavior. The grandmother also reported that Mother took Elijah off his medication because she thought it was causing the child to have uncontrollable head movements. The grandmother observed that Elijah's behavior worsened without his medication.

On April 22, 2021, DCFS made an unannounced visit to the maternal grandmother's home to check on another child that was residing there. At that time, the maternal family reported that C.E. jumped out of a window and was missing. When law enforcement officers arrived, they found C.E. hiding in the bushes in the backyard. Both C.E. and Elijah were taken to the police station after they told the officers that Mother physically abused them.

At the police station, the social worker interviewed the children about the abuse allegations. While C.E. denied that anyone abused him, Elijah reported that Mother's boyfriend, Richard, hit him in the stomach and punched him in the mouth. Following these interviews, the social worker spoke with several maternal family members, including the grandmother, aunt, and uncle, but was unable to find a suitable relative placement for the children.

When the social worker contacted Mother, she refused to pick up the children. Mother said she was tired of chasing them

and being called a "bitch." She also stated that she loved the children, but was no longer able to care for them. The social worker inquired if the children could stay with a maternal relative for the weekend while DCFS searched for a placement. Mother replied, "just take them" and "put them in foster care." She then ended the call. The social worker again called Mother and asked if she understood the children would be detained. In response, Mother said she had been through this before. She reiterated she could not care for the children, and was not making a plan for them. She noted that the children needed help beyond what she could provide.

As the social worker drove the children to the DCFS office, both Elijah and C.E. removed their seat belts, tried to pull her hair, and called her vulgar names. Once inside the building, the children threw themselves on the floor. Elijah then began exhibiting sexualized behavior, including making lewd statements and threatening to expose his penis and masturbate. He also bit, kicked, and punched DCFS staff. As the staff were dealing with Elijah, C.E. ran into the parking lot and disappeared. DCFS later found C.E. back in the building on a different floor.

Due to Elijah's conduct, five DCFS staff members kept watch over the children. At times, Elijah continued to display aggressive behavior, and attempted to physically assault the staff. In calmer moments, Elijah tried to hug and kiss the staff, and referred to the female social workers as his "girlfriends" or "wives." While Elijah recanted his prior statements about Richard's physical abuse, C.E. reported that Richard would throw beer cans at him.

DCFS placed C.E. in shelter care. A psychiatric mobile response team (PMRT) determined Elijah was a danger to himself or others and qualified for a psychiatric hold. At the hospital, Elijah continued his combative behavior with the medical staff. A hospital psychiatrist advised DCFS that Elijah would benefit from inpatient treatment.

On April 23, 2021, Mother called the social worker. She again stated that she loved her children, but lacked the ability to care for them based on their behaviors. The social worker informed Mother that Elijah was on a psychiatric hold, and that C.E. would be placed in foster care.

On April 29, 2021, the juvenile court held the detention hearing. Mother appeared and submitted a Parental Notification of Indian Status (ICWA-020) form in which she indicated that she did not have any Indian ancestry. Mother also denied any Indian ancestry in her initial interview with DCFS. At the hearing, the court found ICWA did not apply. The court detained the children from Mother, ordered no contact between Richard and the children, and granted monitored visits to Mother a minimum of three times per week. The court ordered referrals for Mother for services, including psychological counseling, parenting education, and housing and transportation assistance. The court also ordered mental health services for both children.

III. **Jurisdictional and dispositional report**

For its June 14, 2021 jurisdictional and dispositional report, DCFS conducted additional interviews with the family. Between April and May 2021, Elijah remained on a month-long psychiatric hold. In May 2021, C.E. also was hospitalized as a danger to himself and others. Both children were diagnosed with ADHD and a mood disorder, and were prescribed psychotropic

7

medication. As of June 2021, the children were residing in separate foster homes while receiving Intensive Field Capable Clinical Services (IFCCS).

As to the allegations that Mother neglected the children by failing to provide for Elijah's mental health needs and to provide both children with proper care and supervision, Elijah stated that Mother took him off his medication because she said he did not need it. He also stated that "we stopped going to the doctor." C.E. confirmed that Mother stopped giving Elijah his medication, which led to worse behavior. While C.E. denied that Mother said she was unable to care for the children, Elijah reported that Mother made this statement. According to Elijah, "she said she couldn't raise us no more so she gave us up. . . she was happy when she said it . . . she was crying when the social worker came."

In her interview, Mother denied that she neglected Elijah's medical needs. As described by Mother, she had been trying to get Elijah to take medication, but "everyone turned [her] away." She reported that Elijah was diagnosed with ADHD and autism at age six, and that he consistently took psychotropic medication until his doctor at Augustus Hawkins stopped the medication when the child was nine years old. Mother stated that, since 2018, she had been seeking services for Elijah from different facilities, but was told the child did not need medication or therapy. When asked for more detail about her efforts to obtain services for Elijah, Mother replied, "I can't give you dates or timeframes, everywhere I went they turned me down."

Mother also denied that she was unwilling or unable to care for Elijah and C.E. She claimed that DCFS "twisted [her] words," and that she solely asked that the children be placed in

8

foster care until she was stable. She later denied that she ever asked DCFS to place the children in foster care, and asserted that she only sought services to help with their behavior. At one point, Mother became upset and stated, "[S]ince they put these lies on me, ima tell you how it is, exactly how it is. They . . . act out. They call me names and tell me [f]uck you [b]itch, kiss my ass. Elijah be punching me. He bumps his head and scratches himself. He took out a knife one time . . . I had to hold him until he calmed down. On a bad day, Jesus, they all over the place . . . it takes a while to calm them down." When asked whether she sought any mental health services for C.E., Mother replied that the child received services through his school.

As to the allegations of physical abuse, Elijah stated that Richard hit him in the mouth and stomach with a closed fist, and that Mother was present for the incidents, but did not intervene. C.E. initially confirmed that Richard hit Elijah, but recanted his statement when asked if Mother knew of the abuse. Mother denied that Richard ever hit the children. As to the allegations of substance abuse, Elijah reported that Richard drank beer on a daily basis. C.E. stated that Richard smoked marijuana and drank beer, and Mother smoked marijuana but did not do so around the children. Mother denied any current drug use. While Mother indicated that she and Richard were married, she refused to provide further information about him, and insisted that he not be part of DCFS's investigation.

Because Mother reported that Elijah previously received mental health services at Augustus Hawkins and Kedren Community Health Center, DCFS sought Elijah's medical records from both facilities. Augustus Hawkins did not have any record of services for Elijah from 2018 onward, even though Mother

9

reported that a doctor at that facility had discontinued the child's psychotropic medication. Kedren's records showed that, on two occasions in 2018, Mother took Elijah to that facility to "re-establish" mental health services. Mother last took Elijah to Kedren in November 2018, and although she agreed to therapy for the child at that time, she never scheduled a follow-up appointment.

As of June 2021, Mother had not had any in-person visits with Elijah or C.E. because both children had been on psychiatric holds. Although Mother had one phone visit with C.E., she was unable to redirect the child's aggressive behavior during the call. After Elijah's caretaker reported that a man named Richard called asking for the child, DCFS reminded Mother that the court ordered no contact between the children and Richard. While Mother denied any involvement in Richard's efforts to contact Elijah, she also stated that she did not agree with the no-contact order.

According to DCFS's report, Mother participated in an Upfront Assessment in March 2021. The assessment report recommended that, among other services, Mother undergo a psychiatric evaluation, receive a referral to a Regional Center, and enroll in parenting classes for children with special needs. When DCFS discussed these recommendations with Mother, she declined to participate in a psychiatric evaluation or in any Regional Center services because she believed she did not have a mental health problem. She also refused to disclose the reason she received SSI benefits, or to provide any information about her mental health history. In its report, DCFS noted Mother appeared to have a mental health or developmental issue, which

hindered her ability to understand the circumstances that placed her children at risk.

## IV. Last minute information reports for the court

Between September 2021 and February 2022, DCFS filed a series of last minute information reports on the family's status and progress with services. In its reports, DCFS recounted numerous incidents in which Elijah and C.E. continued to engage in violent, destructive, and sexually inappropriate behaviors. The children's conduct included hitting, punching, biting, making lewd comments to women and girls, and threatening to harm or kill DCFS staff, medical personnel, their foster families, and themselves. On one occasion, Elijah grabbed a social worker by the neck, punched her in the head, face, and stomach, and then chased her with a metal pole. On another occasion, he grabbed the breasts and genitals of shelter care staff, and threatened to rape a female staff member. The severity of the children's mental health and behavioral issues led to multiple changes in placement, law enforcement calls, and psychiatric holds. In September and October 2021, Elijah repeatedly was hospitalized as a danger to himself and others. As of October 2021, DCFS removed both children from their foster homes and placed them at the Five Acres short-term residential therapeutic program.

In November 2021, the Department of Mental Health submitted an assessment report for Elijah. The report noted that Elijah likely had "early exposure to multiple traumatic events of an invasive, interpersonal nature," which led to his "significant emotional and behavioral problems." It also indicated that the child appeared to have "an undiagnosed intellectual disability," which "hindered [his] ability to benefit from mental health treatment." Although the school district had recommended a

Regional Center evaluation for Elijah since he was in kindergarten, no such evaluation occurred. The report recommended that Elijah undergo a Regional Center evaluation and a Fetal Alcohol Syndrome assessment once he was stabilized. It further recommended that Elijah be placed in a highly structured residential program with experience in treating children with intellectual disabilities and aggressive behaviors.

As of February 2022, Mother had not enrolled in services even though DCFS provided her with multiple referrals. She failed to show up for scheduled appointments with the social worker. She also failed to participate in any meetings regarding the children, including individual education plan (IEP) and child and family team (CFT) meetings. Although Richard told DCFS that he was open to services, Mother was adamant that she did not want Richard involved in the case because he was not the children's father. During one in-person meeting with DCFS, Mother appeared to be under the influence of drugs, but she refused to submit to an on-demand drug test at that time.

Following the children's placement at Five Acres, the staff there tried to assist Mother with a visitation schedule. Mother would not, however, commit to a date or time for visiting the children. When DCFS spoke to Mother about her failure to visit the children for several months, she cited transportation issues. She also stated that she called the children once a week and was in the process of setting up virtual visits. After the social worker reminded Mother of the importance of in-person visitation, she agreed to start visiting the children on Saturday afternoons.

After a due diligence search, DCFS was able to locate Elijah's alleged father, Michael. However, Michael informed

DCFS that he was not the child's biological father, and he declined to be interviewed.

## V. Jurisdictional and dispositional hearing

On February 4, 2022, the juvenile court held a combined jurisdictional and dispositional hearing. After hearing argument from counsel, the court sustained the counts in the amended petition pertaining to Mother's medical neglect of Elijah, Mother's inability to provide ongoing care and supervision to both children, Richard's physical abuse of Elijah, and Richard's and Mother's substance abuse. The court dismissed all other counts.

The court declared Elijah and C.E. dependents of the court under section 300, subdivisions (b) and (j), removed them from Mother's custody, and ordered reunification services for Mother. Mother's case plan included on-demand drug testing, individual counseling to address case issues and parenting children with special needs, and conjoint counseling with the children when deemed appropriate by the children's therapists. It also included mental health services, which required Mother to submit to a psychiatric evaluation and to take any prescribed psychotropic medication. The court noted "there's an element of mental health underlying Mother's conditions or perhaps a lack of education and understanding." The court ordered monitored visitation for Mother a minimum of three times per week, and granted DCFS the discretion to liberalize Mother's visits.

Mother filed a timely appeal.

## DISCUSSION

## I. Jurisdictional findings and removal order

On appeal, Mother challenges the sufficiency of the evidence supporting the juvenile court's jurisdictional findings and removal order. She argues the evidence was insufficient to

13

support each jurisdictional finding because DCFS failed to prove that any conduct by Mother or Richard placed the children at substantial risk of harm at the time of the jurisdictional hearing. Mother also asserts there was insufficient evidence to support the removal order because DCFS failed to establish that removal from Mother was the only reasonable means of protecting the children from the risk of harm.  We conclude substantial evidence supported the juvenile court's exercise of jurisdiction over the children and its order removing them from Mother's custody.

### A.    Standard of Review

"At the first stage of dependency proceedings, the juvenile court determines whether the child is subject to juvenile court jurisdiction; DCFS has the burden to prove jurisdiction by a preponderance of the evidence.  [Citation.]  At the second stage, the juvenile court must decide where the child will live while under juvenile court supervision; to support removal from parental custody, DCFS has the burden to prove by clear and convincing evidence that there is a risk of substantial harm to the child if returned home and the lack of reasonable means short of removal to protect the child's safety." (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.)

We review challenges to the sufficiency of the evidence underlying jurisdictional findings and dispositional orders for substantial evidence.  (*In re I.J.* (2013) 56 Cal.4th 766, 773.) " ' "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." ' " (*Ibid*.)  "When reviewing a finding that a fact has been proved by

14

clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)

B. **Substantial evidence supported the juvenile court's exercise of jurisdiction under section 300, subdivisions (b) and (j)**

Section 300, subdivision (b)(1) provides, in relevant part, that a child comes within the jurisdiction of the juvenile court if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [t]he failure or inability of the child's parent or guardian to adequately supervise or protect the child" (*id.*, subd. (b)(1)(A)), or "[t]he willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment" (*id.*, subd. (b)(1)(C)). To support a finding of jurisdiction under section 300, subdivision (b)(1), the child welfare agency must prove three elements: " '(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the minor, or a "substantial risk" of such harm or illness.' " (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561.) The court " 'may consider past events in deciding whether a child currently needs the court's protection. [Citation.] A parent's " '[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." ' " (*In re J.A.* (2020) 47 Cal.App.5th 1036, 1048.)

Section 300, subdivision (j), authorizes jurisdiction if the "child's sibling has been abused or neglected, as defined in

15

subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected." A jurisdictional finding under section 300, subdivision (j), has two elements: "first, that the [child's] sibling has been abused or neglected, and second, that there is a substantial risk that the [child] will be abused or neglected." (*In re Ashley B.* (2011) 202 Cal.App.4th 968, 981.) In determining whether the child is at substantial risk, the court must "consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative." (§ 300, subd. (j).)

In this case, there was substantial evidence to support the juvenile court's exercise of jurisdiction over the children under section 300, subdivisions (b) and (j), based on Mother's medical neglect of Elijah and inability to provide both children with ongoing care and supervision. There was ample evidence in the record that Mother failed to ensure Elijah received adequate treatment for his serious mental health condition. Mother told DCFS that Elijah was diagnosed with ADHD and autism at age six, and that he took psychotropic medication until age nine. Mother claimed Elijah's treating physician at Augustus Hawkins discontinued the child's medication. However, Elijah, C.E., and the maternal grandmother all confirmed that Mother decided to stop the medication. While the maternal grandmother stated that Mother did so because she believed the medication caused Elijah to have uncontrollable movements, Elijah asserted that Mother told him he did not need it. Yet Elijah's family, including Mother, informed DCFS that, after the child stopped taking medication, his behavior worsened.

16

The evidence further showed that Mother failed to seek mental health treatment for Elijah despite the child's escalating behavior.  When DCSF first inquired about mental health services for Elijah and C.E., Mother stated that she was focused on finding a home, and that she was not stable enough to ensure the children attended therapy.  Mother later claimed she had been seeking services for Elijah from different mental health facilities, including Augustus Hawkins and Kedren, since 2018, but was told the child did not need medication or therapy.  According to Mother, "everywhere I went they turned me down."  However, Augustus Hawkins did not have any record of services for Elijah from 2018 or later.  While Kedren did have records, they showed that Mother last sought services for Elijah in November 2018, but failed to follow through with the proposed therapy plan.  In his interview with DCFS, Elijah confirmed that, at some point, Mother stopped taking him to the doctor.

By the time DCFS became involved with the family in 2021, both Elijah and C.E. were exhibiting severe behavioral issues.  C.E. repeatedly ran away, and on one occasion, the police found the child barefoot on the street smoking a cigarette.  In an interview with DCFS, Mother acknowledged that both children would act out, cursing at her and calling her vulgar names.  Elijah also punched Mother, and he once pulled out a knife.  Mother's inability to manage the children's behavior culminated in her refusal to pick them up from a police station on April 22, 2021.  At that time, Mother advised DCFS that she loved the children, but she was no longer able to care for them.  Rather than make a plan for the children's placement, she told DCFS to "just take them" and "put them in foster care."

On appeal, Mother asserts that when she told DCFS she could no longer care for the children, she was speaking out of frustration and "did not really mean what she said." She further argues that, at the time of the jurisdictional hearing, she was willing to engage in services for the children, including seeking psychiatric care for Elijah. The record reflects, however, that, as of the February 4, 2022 jurisdictional hearing, Mother made no progress in addressing the issues that led to the children's detention and placement in foster care. She refused to enroll in services despite receiving multiple referrals from DCFS. She failed to attend scheduled appointments with DCFS and to participate in IEP and CFT meetings held for the children. She did not show that she had gained any insight into the children's significant behavioral issues or how to appropriately manage them. On this record, the evidence was sufficient to support the jurisdictional findings based on Mother's failure to ensure that Elijah received adequate medical care, and to provide both Elijah and C.E. with proper care and supervision.

Where, as here, " 'a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' " (*In re I.J., supra*, 56 Cal.4th at p. 773.) Because there was substantial evidence supporting the juvenile court's exercise of jurisdiction based on Mother's medical neglect of Elijah and inability to care for both children, we need not

18

consider whether jurisdiction also was proper based on the physical abuse and substance abuse allegations.

## C. Substantial evidence supported the juvenile court's removal order

" 'At the dispositional hearing, a dependent child may not be taken from the physical custody of the parent under section 361 unless the court finds there is clear and convincing evidence there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned home, and that there are no reasonable means to protect the child's physical health without removing the child.' " (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1065; see § 361, subd. (c)(1).)  The court must determine "whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home" and "shall state the facts on which the decision to remove the minor is based."  (§ 361, subd. (e).)

In determining whether to remove a child from parental custody, "the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.)  The court "must also consider whether there are any reasonable protective measures and services that can be implemented to prevent the child's removal from the parent's physical custody."  (*Ibid*.)  "A removal order is proper if it is based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent.  [Citation.] The parent need not be dangerous and the minor need not have been harmed before removal is appropriate.  The focus of the

19

statute is on averting harm to the child." *(In re T.W.* (2013) 214 Cal.App.4th 1154, 1163; accord, *In re D.B.*, at p. 328.)

In this case, the same evidence that supported the juvenile court's jurisdictional findings based on Mother's medical neglect of Elijah and inability to care for the children also supported its removal order. (§ 361, subd. (c)(1); see *In re D.B., supra*, 26 Cal.App.5th at p. 332.) Over the course of the dependency proceedings, Elijah and C.E. each exhibited serious mental and emotional health issues. Due to the severity of these issues, Mother was unable to provide the children with adequate care and supervision, and asked DCFS to place them in foster care. Following their detention, the children received intensive mental health services, but continued to display a pattern of physically aggressive and assaultive behaviors. At various times, each child was hospitalized as a danger to himself or others. After changing the children's foster care placements multiple times due to their behaviors, DCFS placed them in a short-term residential therapeutic program. A mental health assessment for Elijah recommended placement in a highly structured residential program with experience in treating children with intellectual disabilities and aggressive behaviors. Given this evidence, the juvenile court reasonably could find that the children would be at substantial risk of harm if returned to Mother, and that removal was the only reasonable means of protecting them from such risk.

Mother contends that, instead of removing the children, the juvenile court should have offered her services, such as family therapy, and housing and transportation assistance to help her maintain the children in her care. The record shows, however, that, at the April 29, 2021 detention hearing, the court ordered mental health services for the children and referrals for services

20

for Mother, including counseling, parenting education, and housing and transportation assistance. Although DCFS repeatedly provided Mother with referrals, she declined to enroll in the recommended services. Moreover, while Mother's husband, Richard, indicated that he was open to services, Mother insisted that Richard not have any involvement in the case. DCFS also observed that Mother was not forthcoming about her mental health history, and she appeared to lack the ability to understand how her actions could have contributed to the children's behavioral issues. On this record, the evidence was sufficient to support the juvenile court's order removing the children from Mother's custody.

## II. Dispositional order for mental health services and monitored visitation for Mother

Mother also challenges the juvenile court's dispositional order, requiring her to participate in mental health counseling and restricting her visitation with the children to monitored visits. We conclude the juvenile court did not abuse its discretion in fashioning its dispositional order.

### A. The juvenile court did not abuse its discretion in ordering Mother to participate in mental health services

At the dispositional stage, the juvenile court may make "all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child." (§ 362, subd. (a).) The court also may "direct any reasonable orders to the parents or guardians of the child who is the subject of any proceedings . . . as the court deems necessary and proper to carry out this section," including orders "to participate in a counseling or education program." (*Id.*, subd. (d).) "At disposition, the juvenile

21

court is not limited to the content of the sustained petition when it considers what dispositional orders would be in the best interests of the children. [Citations.] Instead, the court may consider the evidence as a whole." (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311.) " '[T]he juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion. [Citations.] The court's determination in this regard will not be reversed absent a clear abuse of discretion.' " (*In re Corrine W.* (2009) 45 Cal.4th 522, 532.)

Mother argues she did not need mental health services because she denied any history of mental health problems or developmental delays. While Mother refused to disclose any information about her mental health history, the juvenile court reasonably could determine that requiring Mother to participate in mental health counseling, including a psychiatric evaluation, would best serve the children's interests. Mother's Upfront Assessment recommended that she receive a psychiatric evaluation and referral for Regional Center services. Mother made clear, however, that she would not agree to these services absent a court order. Because DCFS suspected that Mother might have a mental health or developmental issue that was impeding her ability to properly care for the children, the agency also recommended mental health counseling as part of her reunification plan. In ordering Mother to participate in a psychiatric evaluation and to take any prescribed psychotropic medication, the court agreed that "there's an element of mental health underlying Mother's conditions or perhaps a lack of education and understanding." Given these concerns, the

22

juvenile court did not abuse its discretion in ordering mental health services for Mother.

### B. The juvenile court did not abuse its discretion in ordering that Mother's visits with the children be monitored

A dispositional order granting reunification services to a parent must provide for visitation "as frequent as possible, consistent with the well-being of the child." (§ 362.1, subd. (a)(1)(A).)  However, "[n]o visitation order shall jeopardize the safety of the child." (*Id.*, subd. (a)(1)(B).)  "The power to regulate visits between dependent children and their parents rests with the juvenile court and its visitation orders will not be disturbed on appeal absent an abuse of discretion." (*In re D.P.*, *supra*, 44 Cal.App.5th at p. 1070.)  An abuse of discretion exists only where the juvenile court " ' 'has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

Mother asserts the juvenile court abused its discretion in ordering that her visits be monitored because she was closely bonded with the children and was open to receiving services for them.  Because Mother never objected to the order for monitored visits in the juvenile court, she forfeited the issue on appeal.  (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293, superseded by statute on other grounds as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962.)  Even if not forfeited, Mother's claim lacks merit.  Following the children's placement in the Five Acres residential program, Mother did not visit them for several months.  While the staff at Five Acres tried to assist Mother with visitation, she would not commit to a schedule, and she only agreed to visit the children once per week after DCFS stressed the importance of in-person

visits. Mother continued to object to the court's order that Richard not have contact with the children. She also declined to participate in mental health services until ordered to do so by the court. Given the severity of the children's behavioral issues and Mother's lack of insight into those issues, the juvenile court acted well within its discretion in ordering monitored visitation for Mother.

## III. ICWA

Mother contends the juvenile court erred in finding that ICWA did not apply because DCFS failed to comply with the inquiry requirements of ICWA and related California law. She claims DCFS's ICWA inquiry was inadequate because the agency did not ask maternal extended family members or Elijah's alleged father, Michael, whether the children had any Indian ancestry. We conclude the matter must be remanded for DCFS to conduct an ICWA inquiry of the maternal side of the children's family, but not of Elijah's alleged father who denied paternity.

### A. Governing law

ICWA mandates that "[i]n any involuntary proceeding in a [s]tate court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe" of the pending proceedings and the right to intervene. (25 U.S.C. § 1912(a).) Similarly, California law requires notice to the child's parent, Indian custodian, if any, and the child's tribe if there is "reason to know . . . that an Indian child is involved" in the proceeding. (§ 224.3, subd. (a).) Both juvenile courts and child protective agencies "have an affirmative and continuing duty to inquire whether a child for whom a petition under Section

24

300 . . . may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 14.)

At the first appearance of each party, the juvenile court must inquire whether that party "knows or has reason to know that the child is an Indian child," and must "instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." (§ 224.2, subd. (c).) Additionally, when a child protective agency takes a child into temporary custody, it must inquire of a nonexclusive group that includes the child, the parents, and extended family members "whether the child is, or may be, an Indian child." (*Id.*, subd. (b)). Extended family members include adults who are the child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent. (25 U.S.C. § 1903(2); § 224.1, subd. (c).)

"If the [juvenile] court makes a finding that proper and adequate further inquiry and due diligence . . . have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] does not apply to the proceedings, subject to reversal based on sufficiency of the evidence." (§ 224.2, subd. (i)(2).) We generally review the juvenile court's ICWA findings under the substantial evidence test, " ' "which requires us to determine if reasonable, credible evidence of solid value supports the court's order." ' " (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.)

**B.    Remand is required for ICWA compliance as to the children's maternal family**

With respect to the children's maternal family, Mother asserts DCFS failed to comply with its duty of inquiry because it did not ask known and available extended family members about

25

the children's possible Indian ancestry. We agree DCFS's inquiry was inadequate as to the maternal side of the children's family.

The record reflects that, over the course of the dependency proceedings, DCFS had contact with the maternal grandmother, a maternal aunt, and a maternal uncle. There is no indication in the record that DCFS asked any of these maternal relatives whether Elijah and C.E. might be Indian children. In the absence of any evidence that DCFS complied with its duty to inquire of these known and available extended family members, as required by section 224.2, subdivision (b), the juvenile court's implied finding that DCFS fulfilled its duty of inquiry as to the maternal side of the children's family was not supported by substantial evidence. (See, e.g., *In re Jayden G.* (2023) 88 Cal.App.5th 301, 311 [ICWA error where DCFS failed to inquire of available extended family members for whom it had contact information]; *In re J.W.* (2022) 81 Cal.App.5th 384, 389 [ICWA error where DCFS did not ask mother's extended family members about their Indian ancestry, despite having contact with maternal grandmother, uncle, and aunt]; *In re M.M.* (2022) 81 Cal.App.5th 61, 70, review granted Oct. 12, 2022, S276099 [ICWA error where no inquiry was made of extended family members with whom DCFS was in contact].)

We reach a different conclusion, however, with respect to the Elijah's alleged father. Mother argues DCFS's inquiry also was inadequate because the agency never asked Michael if Elijah's paternal family had any Indian ancestry. As DCFS asserts, however, ICWA does not apply to an alleged father. ICWA defines a "parent" as "any biological parent or parents of an Indian child or any Indian person who has lawfully adopted an Indian child, including adoptions under tribal law or custom.

26

It does not include the unwed father where paternity has not been acknowledged or established." (25 U.S.C. § 1903(9).) Under California law, "[a]n alleged father may or may not have any biological connection to the child." (*In re E.G.* (2009) 170 Cal.App.4th 1530, 1533.) But "absent a biological connection, the child cannot claim Indian heritage through the alleged father." (*Ibid.*; see *In re Daniel M.* (2003) 110 Cal.App.4th 703, 707–708 [alleged father lacks standing to challenge ICWA violation].) Here, Michael never appeared in the dependency proceedings, nor did he take any action to prove a biological connection to Elijah. Instead, Michael denied that he was Elijah's biological father, and he declined to be interviewed by DCFS. Thus, there was no inquiry error with respect to Elijah's alleged father.

As to DCFS's failure to inquire of the children's maternal extended family members, appellate courts have adopted several divergent standards for determining whether an ICWA inquiry error is prejudicial. (See *In re K.H.* (2022) 84 Cal.App.5th 566, 611–618 [summarizing approaches for assessing prejudice at the inquiry stage].) In this case, however, we need not decide which standard of prejudice applies. As DCFS acknowledges in its respondent's brief, because the juvenile court continues to have jurisdiction over the children, both the court and DCFS "have an affirmative and continuing duty to inquire whether" Elijah or C.E. "is or may be an Indian child." (§ 224.2, subd. (a).) Even where the court has made a prior finding that ICWA does not apply, it must reverse that finding "if it subsequently receives information providing reason to believe that the child is an Indian child." (*Id.*, subd. (i)(2).)

While DCFS asks that we affirm the ICWA finding, it asserts that, "[a]lternatively, reversal of only the ICWA finding

27

and remand for inquiry is also an appropriate relief."  Given the procedural posture of this case and the juvenile court's continuing jurisdiction over the children, we conclude the proper remedy is to conditionally affirm the dispositional order and remand the matter for ICWA compliance as to the children's maternal extended family.

## DISPOSITION

The juvenile court's dispositional order is conditionally affirmed, and the matter is remanded for compliance with ICWA and related California law.  On remand, the court must promptly direct DCFS to comply with its duty of inquiry in accordance with section 224.2 by interviewing known and available maternal extended family members about the children's possible Indian status.  If that information establishes a reason to know that an Indian child is involved, notice must be provided in accordance with ICWA and section 224.3.  The court must determine, on the record, whether the ICWA inquiry and notice requirements have been satisfied and whether Elijah or C.E. is an Indian child.  If the court determines Elijah or C.E. is an Indian child, it must vacate its dispositional order and conduct a new dispositional hearing, as well as all further proceedings in accordance with ICWA and related California law.  If not, the court's original dispositional order shall remain in effect.


VIRAMONTES, J.


WE CONCUR:


GRIMES, Acting P. J.


WILEY, J.